May 20, 2016 Court of Appeals The question this Court has to answer is whether the plaintiffs have demonstrated that the military is constitutionally barred from implementing its policy of presumptively disqualifying those with gender dysphoria from further service. And with medical conditions in particular, we begin on the premise that the vast majority of Americans are disqualified from military service. As noted in 2 ER 115, 71% of 17 to 24-year-olds in America would be disqualified from the military without a waiver. So the other side isn't necessarily saying you have a right to be in the military, correct? Correct, Your Honor. And there is one recent landmark Supreme Court case that helps the Court answer this question as to whether the military can carry out its policy, and that's United States v. Scarametti. Well, how does that help us at all? It doesn't, it deals with a case, it doesn't reach the equal protection, the question of whether or not this is a suspect or a class that requires intermediate scrutiny, right? That's correct, Your Honor, but it does guide the inquiry on how to do an equal protection analysis. Well, see, but if we were doing a rational basis analysis, we might reach one conclusion. And if we're doing an analysis based on intermediate scrutiny, we might reach another. And at least in this circuit, we have to apply intermediate scrutiny, do we not? Yes, Your Honor, so let me back up for one second. I don't know how Scarametti helps me apply intermediate scrutiny to the classification in this case. So, Your Honor, it answers the question of before we get to what tier of scrutiny, because it asks what does the policy classify on... Counsel, you just answered Judge Hurwitz's question about in this circuit we apply intermediate scrutiny, and you said yes. If we determine that this policy classifies on the basis of transgender status... Okay, how would we not determine that? Because, Your Honor, when you look at the face of the policy and what it classifies based on here, the United States v. Scarametti and the reason that it's important here... It's not a diagnosis. That's the argument that you make in the brief. But the policy goes considerably broader than the diagnosis, sir. So, Your Honor, United States v. Scarametti goes directly into what it says on its face, and its face says gender dysphoria. I'm talking about this case. Yes, Your Honor. And this policy, right? And this policy sweeps in much more broadly than just the diagnosis is what I'm trying to get at. No, Your Honor, we disagree with that premise. So, you disagree with the President's executive order, which says that my goal is to remove transgender people from the military? Your Honor, what matters is right now the policy... So, is the policy consistent with the President's executive order? Or is the policy narrower than the President's executive order? So, Your Honor, all the executive order did was direct the agencies to come up with a policy... To come up with a policy that removed all transgender people from the military because they're dishonest liars and not loyal. That's what the President of the United States said. The Secretary of Defense then promulgated a policy. So, see if you can answer my question. Do you think the policy that the Secretary of Defense promulgated was narrower than the policy that the President told him to promulgate? Or should we interpret the policy he promulgated in light of what the President instructed him to do? So, Your Honor, the reason that we focus solely on the policy is because that's what actually binds... So, the executive order is irrelevant in your view? At this point, it is because we have the policy that says what it requires to continue... Okay, so now the second part of my question was, because I think Judge Kristen began to ask it before. As I read this policy, there is not a transgender person who would not be presumptively excluded under the policy. And so, in reading the policy, am I entitled to look at the President's executive order which essentially says do that? No, Your Honor, because the policy does not cover every trans-identifying person. So, for instance, the policy says anyone who is suffering from gender dysphoria or symptoms consistent with that... Well, it says more. It says more, to be fair. It says somebody who has suffered, has been treated, has had gender-affirming surgery. When you add all those up together, I'm trying to figure out who's left. So, Your Honor, this policy is very similar, minus the grandfather clause, from the Mattis policy that this court and the D.C. Circuit allowed to take effect. And one of the important notes from Doe v. Shanahan is that it concluded that not everyone covered by the Mattis policy at that time, it did not cover the full universe of trans-identifying people. And it said that absent a waiver, too. So, it didn't base that on the fact that there was a waiver given for grandfathered. You're talking about the executive order and the policy, but before you leave to go to it, I think Judge Hurwicz is getting ready to pivot. The guidance in this case sweeps in a history of, or a diagnosis of, or symptoms consistent with gender dysphoria. Yes, Your Honor. And the systems consistent with, if you look at 2ER70 footnote 2, it says consistent with the DSM criteria for gender dysphoria. Exactly. So, the DSM 5 criteria says a marked incongruence between one's experienced, expressed, and natal gender of at least 6 months in duration. So, an incongruence between one's experienced, expressed gender identity and natal gender is all people transgender, is it not? No, Your Honor. How is it not? Because it is also... Okay, I feel like I'm playing a little bit of double, like a jump rope, you know, trying to get in here. We have a pretty active panel, so I am curious on that issue if you can, maybe we can uninterrupt it here. Is there a transgender person that does not suffer from gender dysphoria and could qualify for military service? Yes, Your Honor. People who are trans-identifying but don't suffer the clinical distress or impairment of function that's associated with gender dysphoria. That is why the court in Doe 2 v. Shanahan already concluded that the Mattis policy, which in itself listed the term transgender persons in a way that this policy does not. This policy does not use that term and focuses solely on the term gender dysphoria. And when the Supreme Court stayed the injunction in the Mattis guidance, the D.C. Circuit took a look and stated that it does not cover the full universe of trans-identifying people in that case. And they said that, and the grandfather clause in that case did not make the difference. What about the guidance? You're just skipping over the guidance. Is that not applicable here? I'm sorry, Your Honor. The guidance is what I was just reading from, and so when you're answering Judge Callahan's question, you seem to be limiting yourself to a different policy. What about the guidance? So, Your Honor, the policy that we have here and the policy that was there in the Mattis case, it's virtually identical with the exception of the grandfather clause. What about the guidance? The guidance defines this as, I'm not sure why you don't want to answer this question. The guidance defines a diagnosis of gender dysphoria as what the DSM-5 criteria uses. So here's the question. I'm just going to do it one more time, and then I'm going to decide that I'm going to understand you don't want to answer it, to be fair. The guidance includes those who have a history of or a diagnosis or symptoms consistent with gender dysphoria. It is not limited to the diagnosis, sir. So, Your Honor, you can see based on the way that the military is implementing this guidance, which is... How do we know how they're implementing it? That's not in this record, is it? Yes, it is, Your Honor. In page 2ER233, the military's method for implementing it, it states that it's going to be based on a medical review where someone... A medical review. I understand that, but the guidance seems to cover people who are not currently suffering from gender dysphoria. Does it not? So, Your Honor, we disagree with that. We believe that a history of presumptively disqualifies you, but if you've been... Individuals with a history, so 10 years ago, of cross-sex hormone therapy may not be suffering from gender dysphoria today, may they? That's where the waiver comes in, Your Honor. But the waiver is entirely discretionary. It's not a mandatory waiver. It's not a mandatory waiver, but it goes back to what this is. It's a facial challenge to the policy. Well, that's what I wanted to ask you, so thank you. This is a good segue for the thing I'm interested in. I'm not sure this is solely a facial challenge to the policy. We have seven serving service members who have each put in declarations, which would be strange if this were just a facial challenge, and who don't seem to have any difficulties in their service. And we have the Mattis policy, on which one of the things you cite as being the basis for passing intermediate scrutiny, which says we, of course, shouldn't kick out serving members. So, if we were to treat this as an as-applied challenge, what's the government's basis for separating these seven serving members? So, Your Honor, to the extent that this court believes that there's daylight between this case and the United States Peace Committee, then we get into the analysis that this court did in Karnofsky. Okay, so I do believe there's daylight between this case and this committee, and I have seven people that seem to be exemplary service members who've served for a long time, for whom the government makes no contention that gender dysphoria has affected their service. And I have the Mattis policy, which is one of the bulwarks of your case, which says, of course, we shouldn't kick out people who are currently serving. So, if I look at those seven, how does this pass intermediate scrutiny? So, Your Honor, we still believe that intermediate scrutiny should be guided by military deference, and one of the points in the Mattis guidance, it didn't say that the risk that they were talking about, which primarily focused on readiness, unit cohesion, good order, and discipline, and costs are not present by those who are presently serving. Okay, but as to these seven, I'm not talking about any other person. As to these seven people, does the government have any reason why these seven people affect any legitimate concern of the military? They've served for a long time. They seem to have exemplary records. They put in affidavits about those records. You didn't seem to try to rebut them. So, if I focus on, if I treat this as an as-applied challenge by those seven people, why is the policy constitutional as applied to those seven? Because, Your Honor, any particular medical condition can have someone who is able to mitigate those conditions and serve, but that doesn't mean that the military cannot implement a disqualifying condition based on that medical condition. But these seven people that we're positing, if we flip this analysis and recognize the district court didn't have the benefit of CASA versus Trump, and if we decide that the district court didn't have the authority to enter a universal injunction, then we look, pursuant to Citizens United and several other cases where the Supreme Court has said, you still look to see, as to the named plaintiffs, was there authority to enter relief as to those folks. So, if we're looking at those seven for the moment, I'll just look at those seven as Judge Hurwitz has posited, those people not only entered the military, they served with distinction. So, Your Honor, it still goes back to the idea that the military is owed deference on whether it can carry out that policy as a general matter, and if plaintiffs happen to be within that policy. No, no, not as a general matter. We're talking about as to these seven people. So, Your Honor, the same policy that applies would apply to these seven individuals, and the military is still allowed to carry it out when you talk about how to apply intermediate scrutiny. Well, I guess I'm not following you, because if you can circle back, I was trying to refine and follow up on what Judge Hurwitz was talking about. If we're talking about as to these seven people, how does this policy, how is there any indication that allowing these seven people to serve somehow arose the military's purpose here? So, Your Honor, I take that question, the premise of that question is that these seven individuals should get exemptions from that general policy that the military has implemented. My argument is that the military is not required. I'm not talking about exemptions. I'm talking about means to end fit. How in the world would these folks who are in the military and they served with distinction for a number of years, I'm trying to figure out how there is any means to end fit to further the government's interest here. So, Your Honor, when you look at what the policy does, it presumptively disqualifies based on a medical condition unless you have a waiver, and we have to demonstrate whether when the military is utilizing its professional judgment and is granted deference, whether that applies in that scenario, and Karnofsky did not. You're making, I'm sorry, finish your answer. Yeah, so in Karnofsky, it did not get into an as-applied challenge. It talked to, because even though there were individual plaintiffs that said they could have overcome that, it just asked, one, whether this policy classifies based on trans-identifying status, and then two, if it did, does it satisfy intermediate scrutiny applying the military deference that's due, even though there were individual plaintiffs there. I would like to ask a question right at this, because I was on Karnofsky, but it sort of ended up, we had sent it back, but then the election changed, and so I'm not sure Karnofsky still is good law after Scrimeti. What is your position on that? So, Your Honor, there's two arguments I would make on that. One, you are correct that the Karnofsky court did not have the benefit of Scrimeti in its analysis, but two, there is a way to read the two cases harmoniously here, and the difference being that in the Mattis policy, the term transgender person was used throughout the policy, so in that respect, the court concluded that it classified based on persons rather than conditions. Here, this tracks more with Scrimeti because the transgender person's term is not used at all in the guidance. It is used in the president's executive order. I don't believe the exact term was used. No, he said transsexual in the order, actually. So this brings me back to my question about how the guidance does not, and I think Judge Callahan's first question, how does the guidance not sweep in all transgender people? Because, Your Honor, not all trans-identifying people suffer from gender dysphoria. No, no, no, no, the guidance is not limited to the diagnosis. It includes anyone who's ever had a history of or a symptom consistent with. So, Your Honor, what that means is if you have symptoms consistent with, then the military would refer you, and then if you get a diagnosis, that would be the basis of discharge. Are we clear that these seven named plaintiffs are not eligible for any type of an exemption? They'd be out, right? So, Your Honor, it is correct that these seven individual plaintiffs would not meet the criteria to continue military service based on this policy. Right, so as opposed to any hypothetical other folks, as we talk about these seven people. Now can you circle back and answer my question about the means to end it? Yes, Your Honor. So the military laid out three issues, readiness, good order, discipline, and cost. And they were looking at the long-term implications. That's what the MADIS guidance did. That's what this guidance with the literature review also did, in terms of the long-term effects of allowing those with gender dysphoria. As to these seven plaintiffs, tell me what the long-term concern of the government is. So, Your Honor, let me talk about one. So, for instance, privacy and interest. So in Roe v. Critchfield, this court had decided that... But these people have served now for long periods of time with apparently no concern raised by the government about privacy. I understand your broader class-wide argument. Let's assume this was a case brought by one individual, Schilling, with an exemplary service record. And she said, you can't kick me out because I'm terrific, and this policy as applied to me is unconstitutional. I take it your argument is, well, maybe it would be as applied to you, but we're entitled to apply it across the board, and if you're collateral damage, that's okay. So focus on these seven people and tell me if there's any reason, military reason, why these seven people shouldn't continue to serve. So, Your Honor, when we talk about unit cohesion and good order and discipline, that affects everyone around. So have any of these seven ever affected unit cohesion? I mean, I take it you've served, if you haven't. Yes, Your Honor, I have. I have too. Unit cohesion is sort of a strange thing to talk about. Because God knows what it is. But tell me what these seven people, how any of these seven people have affected unit cohesion in the years and years they've been in the service. So, Your Honor, this points back to Roe v. Critchfield, where the court here said that the government doesn't have to wait until it's an issue for that to be a viable basis to satisfy intermediate scrutiny. The difficulty now is, at the time of the prior policy, the record only included predictive evidence. And now we have actual track record of folks serving openly in the military. And as far as our record goes, it looks like that has happened without incident. So, Your Honor, this is where military deference is an important piece of the puzzle. I would like to understand what your position is on military deference. And I think it's your position that the district court didn't really apply any military deference, correct? That's correct. And just since I have a minute left before my time... No, I'm going to... I'll give you your rebuttal time. We have questions. Okay, so just relax about that. You'll get your rebuttal time. But military deference isn't really a standard of review. The standard of review is whether it's the rational basis or whether it's the heightened scrutiny. But military deference, in some way, injects itself into that. So I would like you to explain to me your position on that. Yes, Your Honor. So the flowchart that I have in mind... So first you have United States v. Scarametti. What does it classify based on its base? If it's a medical condition, rational basis informed by military deference applies. If there is daylight between Scarametti and this case, then we're back into Kornofsky territory where, let's just say, the court believes that it classifies based on persons rather than medical conditions. Then intermediate scrutiny informed by military deference applied. And the way that I would define military deference and when it should apply goes back to Goldman v. Weinberger, which talks about professional military judgment. Did the military utilize its professional judgment when coming up with this policy? The court concluded that the Mattis policy was an exercise of professional judgment and allowed that policy to take effect. The only difference between that one and this one is the grandfather clause, which doesn't change the... That's not the only difference. That's not the only difference. In that case, as Judge Callahan indicated, there was quite an interval and there was a careful study. It took some months, as I recall. That's not the case here, sir. Or at least we don't have that in our record, I should say. Your Honor, the military didn't start from a blank slate when coming up with this policy, so it did have the Mattis policy. Yes, absolutely, and that's what I was referring to earlier because different administrations have gone different ways on this issue, right? But the difficulty is that this time... And I'm really anxious to hear your response to this. The earlier policies were predictive. There was military judgment about what they thought would happen and how they thought it might play out. But as I understand this record, this time around, the policy was announced right away and without regard to... I don't see where it has taken into consideration the several years of time where people were allowed to serve openly in the military even though they're transgender. So, Your Honor, I would preface that by first stating that when the Austin policy took effect, it was done without looking at what happened during the Mattis years. So the military is not required to look at a four-year interval, necessarily. But we're looking for reasoned military judgment is why I ask. So, please, I don't mean to interrupt you, but that's the problem. How is this reasoned military judgment if it disregards actual experience? So, Your Honor, when you're looking at the long-term effects, especially given that a number of people did not transition until later in the Austin policy, and the military is looking at, one, the long-term effects, especially in an area where the science is evolving. So, for instance, Justice Thomas, in his concurrence in the United States Peace Committee, talked about the foundations of the WPAP study that are no longer in effect. So the military should have some leeway when you're talking about science that is evolving. They did a literature review on top of the Mattis study, and that's enough to meet the bar of professional military judgment. What Kornofsky warned the court not to do is to substitute its own evaluation for a reasonable one, which reasonable means if the military utilized its professional judgment in tailoring the policy, which it did in this case, given that it was building off the Mattis policy and did additional literature review on top of that. And I know you want to save time for rebuttal, and Judge Callahan will be— Go ahead. Go ahead. Ask your question, because I have more questions, too. But I'm still focusing on the seven people, and it seems to me what you seem to be saying is that this is a reasonable judgment as applied to people as affected by the policy as a whole. Thank you, Your Honor. The military has exercised its judgment and said the people covered by the policy— let's forget who's covered for a moment—pose some problems, and therefore we don't want to enlist them. We don't want to keep them. But can't we just focus on these seven? In other words, what you seem to be saying is, gee, it's unfortunate we've come up with this policy and we have to apply it across the board because we have concerns about people that are not in the case in front of us. So tell me why it is that military deference requires that we apply this policy across the board, even as to people who pose none of the dangers that you pose. So, Your Honor, the reason for that is the military does that with every medical condition. People can serve honorably with all types of medical conditions, especially ones that they gain in their service. But at the same time, the military is not prohibited from discharging them. Even if they had that medical condition when they enlisted? Yes, Your Honor. So any condition—  No, Your Honor. At this particular point, the process, the way it would work out, is that once they conduct the medical review, they would eventually set out notifications for a discharge board, and when those processes are exhausted, they get discharged. But at this point, my understanding is the notices that they're subject to discharge have not gone out yet. So could you answer Judge Hurwitz's question again? Just assume that at least one of the people on the bench doesn't agree with your premise that this classifies on the basis of transgender diagnosis, but in fact sweeps in for the reasons that you and I have batted back and forth. Because of the guidance, it sweeps in all transgender people. Sure, Your Honor. So the reason that I was highlighting the idea that medical conditions should apply equally across the board is if the court determines— Do you understand the premise of my question? The premise of my question is this is not based on medical condition. Yes, Your Honor. Okay. But the military's claim is that it is. You lose that point. I'm just trying to get you to engage in this. If you lose on that point, then what is your analysis? So yes, Your Honor, whether the military has legitimate interests.  And it does based on readiness, good order and discipline, and cost. But Judge Hurwitz's question has to do with these seven people. So could you tailor your answer to these seven people as to military orderliness and lethality and all of the other goals that the military has identified? Yes, Your Honor. So when you're addressing the long-term costs of allowing people to serve with this condition, let's assume that it captures the universe of trans-identifying people as a premise because we still believe that the military is focused on the condition and no one will be discharged without it. I think we really understand your position on that point. But if you just engage in the hypothetical, please. Yes, Your Honor. Because at that point, it becomes difficult for a court to draw the line as to when the military cannot discharge someone because here's the issue, for instance. So let's just take a condition unique to, let's just say, males throughout the military. We want to look at our history. How about women? Why couldn't the military say all of a sudden now, we were wrong, no women in the military? So, Your Honor, at that point, that would have some particular issues. This is a little bit different. I don't know it would because your position is that this would be unreviewable, that the military's judgment is unreviewable. If the military decides that women are more expensive because some of them get pregnant, for example, or because some of them go through menopause, maybe some of them have to have hysterectomies and that's more expensive. These are silly hypotheticals to be sure. But what would, under your theory of analysis here, what would prevent the military from announcing that rule, sir? So, Your Honor, it would go towards the means end test for intermediate scrutiny, that you would. So, basically, under readiness, for instance, let's just take what deployability, for instance. There are long-term issues, let's say with PTSD or other things, that can't possibly be mapped out based on one individual person's experience. And the issue is whether the military can have that general policy apply across the board. The question is, couldn't they have a policy that excludes women? What would be different in your analysis? It seems to me you would still say that it's unreviewable and that they could say, hey, this particular group, in this case, this hypothetical women, are too expensive. They're out. So, Your Honor, I'm not saying that the policy is not reviewable. I'm saying that the court applies the standard in Karnofsky, which is that... Okay, so let's say the military exercises its judgment and it says that it's done a study and it decides no more women in the military. What would prevent it from doing that? Or maybe your position is that nothing would prevent them from doing that. But I struggle to see the limits of your argument. So, Your Honor, if it was a situation where the full universe of women were covered and discharged instead of based on a medical condition, then you would have issues as to whether there is a legitimate interest that is there. But now you're... I'm interested in this because you're again changing Judge Kristen's hypothetical. Judge Kristen's hypothetical was, assume for purposes of this question that all transgendered people are covered by this policy, that it's not a policy that discriminates on the basis of medical condition. Now, if that's so, then I'm trying to figure out why the military couldn't say, we really don't want women. They're subject to getting pregnant. They have periods. They suffer menopause. They pose additional problems for readiness and deployability. We choose in our military judgment not to have them. Would that policy under this reasoning be okay? So, Your Honor, that same hypothetical would have been present in Kornofsky. I want to answer your question. There's a question. Would that, under your analysis, accepting Judge Kristen's hypothetical that this classifies on the basis of transgender status rather than medical condition, wouldn't it be okay to exclude all women? So, Your Honor, the analysis would still be different because, one, you would have to ask questions about whether the military utilized its professional judgment and under what circumstances. Let's assume they did it exactly the same way as they did it here, which is to say there was a policy that allowed transgender people to serve and they decided to change it based on an executive order from the president. Would that be okay? I'm sorry. Well, it seems to me your answer to the question has to be yes. The military could exclude women if it wanted to. No, Your Honor, because this current policy was based on the Mattis policy, which did a thorough review. It had 13 experts meet over the course of 90 days and came out with a full report and then did a literature review on the issue. So it would be tough to imagine a scenario where the military could utilize its professional judgment and come to that conclusion. The military did that for a long time, sir. So, Your Honor, at this particular point, there is no equivalent study done by the military on the issue, and there would be serious concerns as to whether it meets the qualification for professional judgment, much less meeting the intermediate scrutiny test, if that was the case. But if it did, then the military could do that. So if it satisfied intermediate scrutiny, that is shaped by the military deference. But women already, the Supreme Court has put them in a different class than transgenders, correct? That's correct, Your Honor. I mean, right now we don't know what the Supreme Court's going to do. Scrimeti, they skirted the issue. They didn't decide whether the transgenders are a suspect class. They said they didn't need to because they were dealing with a medical condition. They didn't decide about Bostock, correct? That's correct, Your Honor. Which is the Title VII case, correct? That is correct. And although I think a couple of the justices, perhaps Alito and Thomas, opined that they didn't think that Bostock went over into this area. So we don't really know what they're going to do there. And my understanding is that we also have what Hecox out of this circuit, where cert was granted, and then I think there's another Fourth Circuit case. CBJ, Your Honor, yes. So to date, probably somewhere the Supreme Court's going to have to say whether they're a suspect class and what the level of scrutiny is. It sounds like it's teed up, correct? That's correct, Your Honor. So I'm just not certain what they're going to say. I mean, I'm trying to read the tea leaves. And in this case, the Supreme Court granted a stay at the government's request because they said the government had a probability of success. Now, I don't know what we can read from that. Those two other cases where they granted cert, in those cases, my understanding there wasn't a split in the circuit, but both of those cases struck down the law. That's correct. And applied heightened scrutiny. Does that make any sense? And the district court here did not have the benefit of Scrimeti. That's correct. Even though I think the district court said, even under a rational basis, it would still find that the plaintiffs prevail, right? That's correct. But so would it make sense to remand this to the district court to apply Scrimeti in the first instance? I mean, you think Scrimeti goes to your benefit, correct? So, Your Honor, there is one key aspect of this. The Supreme Court stay in this case was actually granted before Scrimeti had come out. So we believe that there are a wide variety of ways that the court can get to upholding the policy, even if you discount Scrimeti. So you don't want us to hold the case. You want us to decide in your favor. So, Your Honor, we don't believe that remand is necessary. The answer to my question is yes. Very simple question. Do you want us to hold this case or do you want us to decide it? So, Your Honor, we believe that it should be decided on the grounds that the government stated. Thank you. All right. But then that's your assuming that you're winning. You don't get to know that in advance. You don't get to know that in advance is right. And you're saying what standard should we apply? Do you win under both heightened scrutiny and rational basis from your perspective? Yes, we do. And we also have the Supreme Court stay in effect. So we would, while the policy is allowed to take effect, yes, we would welcome a decision from this court rather than a remand. This is a serious question. As Judge Callahan pointed out, there are cases pending in the Supreme Court that may or may not affect the standard of review. And it's possible we could just sit on this case and wait for them. But you don't want us to do that. That's what you just said. So, Your Honor, obviously the court can do whatever. We can do whatever we want. I'm asking what you want. Yes, Your Honor. We do believe that a decision would be appropriate. Thank you. And so, yes, so we believe that we would win whether it's rational basis or intermediate scrutiny, whether it's informed or not informed by military deference. That would be our position. Does my panel have any further questions? All right. We don't have further questions. I'll give you five minutes for rebuttal. Thank you, Your Honor. You'll probably have longer, too. As you can see, we have a lot of questions. So I try to even it up. Appreciate that very much, Your Honor. Thank you. May it please the Court, my name is Sasha Bookert. It was Lambda Legal, and I am here representing the appellees in this matter. Your Honors, before I start, I just want to say that we do believe that this policy is facially unconstitutional, but also certainly as applied to the individual plaintiffs in this matter, the seven plaintiffs that you've been discussing. If you're making a facial challenge, and I want you to address this, you would have to demonstrate that there's nobody to whom the policy could be constitutionally applied. And whether or not gender dysphoria is a marker for the word transgender or whether or not it's just something that many people in the group suffer from, surely there are some people in the group to whom the policy could be constitutionally applied, aren't there? Your Honor, we would respectfully disagree with that assessment. We believe that every transgender person in the military is affected and harmed by this policy. That's a different point. That's a different question. Whether they're harmed by it is not the question. The question is whether or not a policy that disqualified people with gender dysphoria, even if it describes the entire class, couldn't be constitutionally be applied to at least one member of the class. Because in a facial challenge, you have to show that there's no circumstance under which the policy... We've always said, don't bring facial challenges because it's a tough mountain to climb. And so how do you climb that mountain? Surely there are some people in the group of people that you described that may have such severe gender dysphoria that they are disqualified from service. Understood, Your Honor. Well, the policy discriminates against a group of persons. It's not discriminating against a medical condition. So it would apply to everyone. And I would say that in response to your question, I would say that... It applies to everyone, but some people in that group, some people in that group of persons may have disqualifying gender dysphoria. You don't contest that, do you? Your Honor, no, but we would say that... They may be so anxious and suffer from what the DSM talks about, that they're not proper subjects for military service. But just as with the... Sorry, sorry to interrupt. So I'm trying to figure out how it is that you can claim that there is no one to whom the policy may be constitutionally applied. Your Honor, because the policy targets all transgender people, and the military has neutral service-based standards, for example, that the seven plaintiffs have been subjected to. And this is creating... For example, if you want to enlist in the military, you have to go through a screening to assess whether you've got issues with suicidality or if you have other conditions. There's just neutral standards that are available to apply to people that are experiencing gender dysphoria or any other condition. But to label, but to classify all transgender people as presumptively unfit to serve is discriminatory. What about the problem we've got with the district court not having had access to the benefit of CASA versus Trump? Your Honor, we believe that the district court got the analysis right, and we believe that a universal injunction in this case is appropriate because... Well, but basically, CASA doesn't bode well in your favor. I mean, you have to show some extraordinary circumstances. And so you still think you should be entitled to a universal injunction? Yes, Your Honor. The President of the United States has labeled transgender people per se, not a medical condition, but transgender people per se, as dishonorable. Nothing we do can change the opinion of the President of the United States. So why don't your eight named plaintiffs, but I'm focusing on the active duty people for a moment, why don't they get complete relief if the injunction applies to them as opposed to applying to everybody in the world? Because they will be forced to live under a cloud of uncertainty because of the... The injunction will say they cannot be removed from the service because of their transgender status. But from the President on down to the Secretary of Defense... They may all have terrible views and say awful things about your clients. Nothing we do will prevent them from saying anything of those things. So I'm trying to figure out why your clients don't get complete relief. I mean, understand, their lives may not be peachy keen under this Secretary of Defense or this administration, but that's not our job. So they're complaining about a policy being applied to them. What if we were to say it can't be applied to them? Why don't they then have complete relief? Because I just don't think that's a practical solution given the rhetoric that the President has used and the fact that people have to deploy constantly in the service and they're going to be faced with... What can we do to affect the rhetoric that the President used? Well, it's not just the rhetoric, Your Honor. It's infiltrated into policy. There's a policy saying that literally transgender people cannot meet the rigorous standards for military service. I asked you to assume for a moment that we were going to uphold an injunction of application of the policy against the seven active duty members. Why don't they have complete relief under the CASA analysis if we do that? Your Honor, again, because the animus and the viewpoint discrimination that is infiltrated to every part of the military will prevent that from happening. When they're deployed to a new unit, they'll have the same experience. The CASA talks about the authority. This goes back to Judge Callahan's point. It talks about the district court's authority to enter this type of an injunction. I think the arguments you're making, I can well imagine them being this problem being presented, packaged as a class action where there needs to be, of course, commonality, typicality, all of the requirements to identify a class. But Judge Callahan's question really goes to the court's authority to enter this type of an injunction. What's your best answer to Judge Callahan's question? Why did the district court have authority for this? Your Honor, the court made the decision, issued the decision, obviously, before. So we think that the court and the district court's reasoning should be upheld. But the court did ask for guidance from this court if you feel it's appropriate. But we feel like the reasoning was appropriate given the lack of complete relief for the plaintiffs. One thing we pointed out is that in other instances, the Supreme Court has said, there are certainly circumstances where a claim has been argued as a facial challenge. And the Supreme Court has, much more diplomatically than I just did, much more precisely talked about. But that is a fluid concept. And so we don't throw it out necessarily. We look to see whether the court had authority to grant relief to the named plaintiffs. And we've been talking all day about the seven. There's, of course, an eight, and then there's an organizational plaintiff. I want to talk about those as well. But it seems to me now that you're right. The district court didn't have the benefit of CASA, but we do. And so, and this is for the posture of this case, we would have to show that there's a likelihood of success on the merits of the scope of this injunction. And that seems to me to be a really tough hill for you to climb. Judge Callahan asked you the same question. What's your best answer to that? Your Honor, the best answer that I have to that question is that given the animus involved with this and the way that this has been operationalized within the entire U.S. military and characterizing transgender people as being dishonest and lacking selfishness, there is simply no way that they're going to be able to be viewed as equals to their peers and have the same opportunities that other service members are going to have under that cloud of uncertainty. Citizens United said the distinction between facial and as-applied challenges goes to the breadth of the remedy employed by the court. So that's what we're talking about, whether the court had the authority here. The comments that you're talking about, some of them are, I would say, defamatory, certainly disparaging, and I think opposing counsel is quite candid in the district court that there is not evidence in the record to support attributing those attributes to transgender people. But it seems to me, so I've been trying to figure out what to do with that. The district court didn't make an animus finding here, but it seems to me this is the very blatantly disparaging comments that were attributed to transgender people might factor in at the top of the analysis when we talk about the degree of deference to the military. There's some authority for that, some support for that in the Department of Commerce case. But it might factor in at the bottom on the means to end fit. Where do you think that we take into account those very disparaging comments? Your Honor, it's got to be to the scope of the means fit, scope of the harm that's happening here to the plaintiffs. They're not going to be able to serve anywhere without having that cloud of uncertainty over them. That's the best answer I have right now. Okay, I appreciate that. Your Honor, I just wanted to touch on the discussion about Scrimetti. We believe that Karnofsky is still binding law. Scrimetti was very clear. It involved a case where there was a Tennessee statute passed that prohibited certain treatments for transgender youth, and the court held that it classified based on medical use and age. But the court was crystal clear that if it regulated on a class of persons identified on the basis of a specific characteristic, that the analysis in Scrimetti wouldn't apply. Let's assume I agree with you about Scrimetti. I asked your friend whether we should wait for the Supreme Court to decide some of its pending cases, and he eventually said, no, we should go ahead and decide this one now. I take it that's your view, too? I think the case should be decided now. The seven active plaintiffs that we've been talking about, we're in touch with them regularly, and they're already experiencing irreparable harm. But the Supreme Court disagreed with you on that point. They granted a stay in this case. We have to think about what the Supreme Court's doing. How are you reading the tea leaves? I don't think that you can draw any merits conclusions from the stay. Justice Gorsuch and Kavanaugh tell us we should. One conclusion is that the court didn't have authority to enter a universal injunction. I'm sorry, Your Honor. Perhaps one conclusion is that the Supreme Court had a pretty good idea that the district court wasn't going to be left with the authority to enter a universal injunction. Absolutely, and they probably wanted the court to reconsider the case in light of the pending Scrimetti case that was coming out because it was around that time. Oh, that was up in the air. What about the organizational plaintiff? I'm a little bit troubled by that. For standing purposes, we look at who on the day of the complaint was filed. The organizational plaintiff was, but I think at the time, of course, you're advancing a facial challenge then. I think we would have to, if we were inclined to grant relief or think that they're entitled to relief, it would be much more limited than the entire league. Because the executive director, first of all, says that the league includes transgender people. She doesn't say that it's limited to transgender people on this record. That's correct, Your Honor. There are veterans and actively serving members that are members of the Gender Justice League. And there's some retired people, as you mentioned. In order for the ban to be subject to them, they would have to be actively serving. That's correct, Your Honor. And the other thing, I really don't know what to do with this, but executive directors, it's at ER 948. The declaration says that that organization, that the league, advocates on behalf of transgender people in Washington State. So are we talking about a universe of people in the military who are from Washington State? No, Your Honor. Let me just clarify. They're headquartered in Washington State, but they have membership that exists all around the world. Okay. So do you agree, then, if we were to go forward, at most, the league, as an organizational plaintiff, could only represent folks among their membership who are actively serving and who are transgender and who have not retired? Yes, Your Honor. We would be comfortable with that. But is that what you were asking for? You're saying you'd be comfortable with that, but what were you asking for? Yes, Your Honor. We would like full – we are requesting full relief on behalf of the actively serving membership of Gender Justice League who are transgender service members. I have a question about the league. I looked at the district court opinion, and I may have missed it. Did the district court ever make a separate associational standing finding with respect to the league? It probably didn't have to because it had, in front of it, plaintiffs with obvious standing. But did it make any – did it go through the three elements of associational standing? It did not, Your Honor. It did not. Isn't that something we ought to ask the district court to do in the first instance since it's a fact-based analysis? Yes, Your Honor. That would be appropriate. Can I ask you about – I think the name is Mr. Medina, or Medina, the applicant. Is the person who hasn't served yet in a different position than the people who have served? In other words, I take your friend's argument to be you can't point to any particular problems with these seven people, but we want to have a policy that applies across the board. He can correct my mischaracterization of it later if I've mischaracterized it. It seems to me there's a different argument with respect to people who have never served. If people who have never served and a number of them may have a medical condition that may be disqualifying, can the Army be prophylactic and say, we're just not going to admit you into this, into the military? And it seems to me the equities are quite different with respect to the serving members and an applicant. So would you address whether there's a difference between – Well, there's certainly a difference in the standards. The military has a much stronger interest in retaining service members. Their retention policies are extremely liberal, and they don't categorically prohibit actively serving folks under the retention standards if you've got an eating disorder or if you've got anxiety disorder. I'm not sure you're answering my question. My question is, could the military, under even an intermediates level of review, say we have concerns, they're forward-going concerns to be sure, but they're rational, they're in the Mattis report, about effects on our legitimate objectives. So with respect to people that we haven't admitted yet, we just want to avoid those. We may have a different set of interests with respect to people that have served and have been here and have shown that they don't implicate those concerns. So I'm trying to figure out whether there's a difference constitutionally between the two, between the applicant and the people who are serving. No, Your Honor, I think the answer is the same. I was making the distinction between the military's policy, which is different for sessions, but the legal standard remains the same, is that they need to show their homework. They need to show that their policy is supported by justification, showing that there have been, under intermediate scrutiny, that there have been problems. Do there have to have been documented problems under intermediate scrutiny? Or is it only enough that applying military deference, as Judge Callahan, I have the same problem Judge Callahan does, I'm not sure what it means, but I know it's there. Applying military deference, we can say this is not an unreasonable evaluation by the military. No, Your Honor, I think very little deference should be given here for a number of reasons. The Secretary of Defense, Claire, asked the DOD to go, quote, outside the normal DOD issuance process in the memo. And, you know, the testimony that we submitted from the undersecretaries that talked about the process said it was an extreme departure from typical military. It bore none of the hallmarks of standard military policy. It didn't invite stakeholders to discuss the policy. It didn't ask for recommendations. And, you know, the most damning thing, though, is that they just didn't look the last seven years. You know, they prop it up almost entirely on the Mattis report, which came to a different result. They had a reliance exception. This doesn't. And there have been hundreds, if not thousands, of transgender service members that have enlisted in the military in the last four years. And even before that, we have two plaintiffs that have been serving since 2015 and 2016. And there's all kinds of data at their fingertips. They can just look at that. Are you saying the Mattis report is that the Mattis policy is no longer constitutional, given that there's been four years of experience since then? No, Your Honor. The reliance upon the Mattis report to try to prop up the deference question here doesn't hold any water. No, but may I ask you a question? Let's assume we were today faced with the Mattis policy, the policy based on the Mattis report, which is don't enlist, but don't kick out. That's a shorthand for the Mattis policy. Would that be unconstitutional? Your Honor, we would have to take a close look at, if that were another policy that were issued by the DOD. No, just the old policy. Don't stick animus into it. Don't play with the hypothetical. The government says today, we love the Mattis policy and we want to continue it. And you bring a lawsuit on behalf of people who have not yet enlisted, saying that policy is unconstitutional. It would be a closer call for sure, but we would still challenge it as unconstitutional. Under the current state of the law, is gender dysphoria a medical condition? Well, Your Honor, not to be difficult here, gender dysphoria is a diagnosis within the DSM, but it's also a symptom that people experience as part of the diagnosis of gender dysphoria. So, if it is a medical condition and people are not admitted to the military or they're separated from the military after good service for medical conditions under all sorts of circumstances, what kind of policy can there be on gender dysphoria that in your view would pass constitutional scrutiny? Yes, Your Honor, thank you. It would be a policy that didn't target a class of persons, didn't do as this does in every phase of the process, call out that this is about transgender people per se. But wouldn't gender dysphoria always include transgender people? I mean, I'm understanding your position to say not all transgender individuals have gender dysphoria, but wouldn't all people that have gender dysphoria be trans people? That's correct, Your Honor. Okay, so what kind of policy, if it is a medical condition, which Scrimeti seems to indicate that it is, and it is in the DSM, and the military does have the authority to exclude people with certain medical conditions, tell me what would be a policy regarding gender dysphoria that could pass constitutional scrutiny? Your Honor, I would respectfully disagree that Scrimeti says that this applies here, but I think here what would make it constitutional is, aside from the animus and the targeting of persons, is to treat it like a medical condition. They don't treat this like a medical condition. You're not eligible for a disability evaluation process, and you're just presumptively, categorically unfit to serve, which is inconsistent with how they, again, if you look at the retention standards, it's littered with one phrase, and that's absent appropriate treatment, then you've got to go, meaning that assessments are on a case-by-case basis. It's not this general, so it would be treated like a medical condition, like any other medical condition, and it would be backed by science and evidence and some kind of study. Here we have none of those things. Well, but put aside this policy for a second, which seems to define the class of people subject to the policy in a way that encompasses every transgender person because somebody at some point must have suffered from gender dysphoria or had some symptoms of it, but let's just, this is a hypothetical question. Let's assume the policy said we're going to exclude everybody with gender dysphoria, and it turned out that excluded 99% of, with current gender dysphoria, that included 99% of transgender people. Would that be constitutional? You know, without more information, Your Honor, I can't give you that. The problem is when I ask hypotheticals, you don't get any more information. You've got to deal with the information I gave you. It seems to me if this truly were a classification based on a current medical condition or a current diagnosis of something in the DSM, you'd have a much more difficult time, wouldn't you? Your Honor, I think the difference is... the District Court's finding, in effect, that this is a marker. This is a... no matter what this policy says, when you look at it and break it down into its components, it's really discrimination against transgendered people. If it were really only discrimination against people currently suffering from a recognized thing in the DSM, wouldn't you have a much more difficult time? Certainly, Your Honor, because there wouldn't be the other factors that will come to... You're right. My next question, and this is the hard one, is what if it really does match up neatly with the class? In other words, what if there were evidence that everybody in the class of people you want to represent, and this is not a class action, 95% of them have this condition. Does the military really have to have a policy for sorting out the other 5% or can they just exclude the whole group? Your Honor, the burden lies with them to provide justifications to substantially further their objective, and they haven't done it here, and I don't know if they've done it in that context, but that would be the analysis, is to look at what... If they just ignored the last seven years, I would say absolutely not. If they had some kind of evidence, there might be a closer call, but there's just none of that here. Let me ask you about... Are the plaintiff's First Amendment and procedural due process claims dependent on their underlying equal protection claims? In other words, if they do not prevail on the equal protection claims, can they prevail on the First Amendment and procedural due process claims? Yes, Your Honor. They can prevail. Aside from our equal protection claim, are they contingent on the equal protection claim? I'm having a hard time seeing that. I see that the ball of wax for you is the equal protection, that if you lose on that, I don't see how you can win on the other ones. Tell me how you can. Sure, Your Honor. With regard to our procedural due process, we've brought a stigma plus claim, arguing that there's been public disclosures from the executive order on down about transgender people, that it's stigmatic, that we oppose, and that's caused the loss of employment. Is that a procedural due process claim or a substantive due process claim? It's procedural, Your Honor. Tell me what procedure you think your clients have been denied. Thank you, Your Honor. The procedure that the plaintiffs are seeking here is an opportunity to show that they have been harmed by this policy and they disprove the aspersions that have been made against them and to show that they're fit to serve. Once again, if we were to uphold your equal protection claim, you don't have this procedural due process claim as to these seven people, do you? Yes, Your Honor. These are as applied challenges, the procedural due process claim. Okay, so what are we supposed to say? If we grant an injunction as to application of the policy as to these seven people, what other procedure do you think they're entitled to? Your Honor, just again, some opportunity to be able to, whether it's a hearing or just some formal mechanism. What do they have to have a hearing for? They're not being separated. The policy can't be applied against them. Do they get to have a hearing to demonstrate why the court injunction is correct? I just don't understand what the procedural due process claim is on behalf of these seven people if you prevail on your equal protection claim. And if you don't, then it seems to me I don't know what they get to demonstrate in their procedural due process hearing. If we say that it's okay to exclude all people who meet this description in the policy, what do they get to show in their procedural due process claim? Yeah, again, Your Honor, I think I misunderstood the hypothetical. But it's Judge Callahan's question I'm going back to. This is really dependent on your equal protection claim, is it not? Yeah, I would respectfully disagree, Your Honor. Why not? You disagreed, but tell me why. Well, it's contingent on if the court, you know, affirms on the equal protection grounds, that's a different scenario. But what if we say, no, your equal protection claim fails. We've applied whatever level of scrutiny is supposed to be applied and your equal protection claim fails and therefore it doesn't violate the 14th Amendment to implement this policy. What do your clients then get to show at a procedural due process hearing? That we were wrong? No, Your Honor, that the process, that they were, as General Mattis said himself, there's been a promise that's been made that cannot be dismissed. Those are his words. But that's not an equal protection argument. There's a different, so I'm saying assume for a moment that we were to agree with the government. This policy is constitutional in all of its various respects. I don't know what, I'm still having difficulty figuring out what procedure your clients are therefore entitled to that's not provided for by the policy at which they get to say, gee, this is a really stupid idea because I'm a terrific service person. Again, Your Honor, it would be to demonstrate that, to contest the aspersions that have been labeled against them and to prove that they're fit to serve. The way the proceedings are. But if we uphold the policy, it doesn't matter whether they're fit to serve because I'm asking you to assume that you lose the case on equal protection and this is the question that Judge Callahan was asking. Is your procedural due process claim dependent on your underlying equal protection claim? If we were to say, this is a terrific policy, the government can do it. I'm just not sure what process your clients are entitled to thereafter to demonstrate that the Ninth Circuit was wrong. Again, Your Honor, it's not that we're saying that the Ninth Circuit was wrong based on equal protection analysis. It's that they have an interest in having a process that's not a sham. That gives them an opportunity to contest the aspersions and to prove they're fit to serve. Just neutrally as service members, stripping away gender dysphoria. Isn't that your argument? Your argument is that they cannot be labeled as unfit to serve because they're transgender. I'm sympathetic to the argument. We may accept it. That's okay. They're nonetheless entitled to a procedural due process hearing to show that our conclusion was wrong. I want to ask you a separate question. You went back to the Mattis policy. You make an estoppel argument. The estoppel argument, I think, doesn't apply to your applicant, does it? The estoppel argument is people relied on the government's representation. That can't be true as to the person who's applying. I didn't understand. No, Your Honor. That just applies to the assistant. It seems to me there might be great differences. Estoppel requires reliance. Some people hadn't listed well before. Some people continue to serve. Some people may have come out. Aren't those individual questions that are not really subject to universal relief? Your Honor, we would be fine if the court wanted to take this up and assess each of the members. No, the district court didn't, is my point. If we thought the estoppel argument was important, shouldn't we ask the district court to look at the elements of estoppel as to these seven individuals? All of the plaintiffs, all of the applied plaintiffs have served 10 to 20 plus years So they enlisted before. Some of them enlisted before the mattis policy was implemented. That's correct, Your Honor. So they couldn't have acted in reliance on it. Well, I respectfully disagree, Your Honor, because they, you know, in Commander Schilling's declaration, for example, she said she waited until her command made it clear that there was a pathway for her to live open and as to who she is. And so I think that there is... Waited for what? For inducement, for the... So it was a policy change. There was a time where people already in the military, there was an announcement that they would be allowed to serve openly and they self-identified. That's correct, Your Honor. So she waited to identify until that point. Is that what you're saying? That's correct, Your Honor. Okay, and you're containing she acted in reliance on the policy in identifying. And not just that. It was, you know, the military... You didn't answer, Judge, her question. That's an important question. She waited until the policy was announced to self-identify. Is that right? And I don't think you answered the question. Yes, Your Honor. And your contention on the estoppel argument is that it was in reliance on the policy that she self-identified. That, yes, Your Honor, it was in reliance on the policy, but it was also in reliance on, you know, well, at that point... Well, I mean, I don't care how long you've been in place. Your answer has to be yes, doesn't it? Yes, Your Honor. Okay, it doesn't have to be a more complicated answer than yes. We're not trying to make it difficult. Sometimes lawyers forget we really are bound by the record and sometimes there are gaps where you haven't quite said what we think we're gleaning and we're just trying to verify. They're not trick questions. So if the Supreme Court says that transgender is not a suspect class and that we're dealing with a medical condition subject to rational review, can you prevail along with the concept of military deference? Your Honor, we, in this case, argued that it's not just transgender status discrimination, that this is discrimination on the basis of sex, so heightened scrutiny should apply and that it's also discrimination... But if the Supreme Court disagrees with you on that and then it's a rational basis review along with military deference, can you prevail? Your Honor, we would argue that, you know, even if those two were... You know, even if the Supreme Court, you know, ruled against us on those conditions, we would still argue that the animus is still here, so heightened scrutiny should apply as well. Well, but even if there's animus... Well, if the Supreme Court, if you lose at the Supreme Court, you don't get to continue to make that same argument. You can disagree with what the Supreme Court says, but if heightened scrutiny is not the proper review and it's a rational basis and we already know that military deference is a concept that is involved in the law, can you win? I'm sorry, I didn't understand the hypothetical. Yeah, that's the hypothetical. We don't know whether you're going to win or lose. Yes, Your Honor, I think that if this case went up to the Supreme Court and they held that, you know, you couldn't get heightened scrutiny under sex discrimination or transgender status discrimination, that if we had to face a world where we just had rational basis, we would argue that, you know, at least rational basis with bite given the animus argument with regard to this, you know, targeting a group of people and the unusual circumstances around them. So let me ask you about the animus question. The district court didn't reach it. You know, whether or not we don't need to reach it if we were to uphold a district court decision on another basis. Well, let's assume that we're in the world that Judge Callahan described. Let me just make the hypothetical clear so you're not confused. If you're in favor, it goes up to the Supreme Court. The Supreme Court says, no, no, you made a mistake. This is not a gender-based classification. It's not a sex-based classification. Being transgender does not... A classification based on being transgender doesn't push us up to intermediate scrutiny. Go back and deal with this under a rational basis standard. And there were animus. Animus alone doesn't make something unconstitutional. Let's figure out what that would mean. Let's assume there is a rational basis, but there's also animus. You would still lose, wouldn't you? No, Your Honor. So the government can classify on something that might be rational if it also has animus? See, I'm not sure what to read in the animus cases. That's why I'm asking you. Not if it's just a bare desire to harm. No, if there's a bare desire, there's no rational basis, that's easy. He's expressed it in his executive order. But under normal standards of review, we would find that the policy had a rational basis. What will we do in that circumstance? Your Honor, it still doesn't pass rational. I would encourage the court to apply a rational basis, something higher than basic rational basis, given, again, the... Is there something higher than rational basis but lower than intermediate scrutiny? Again, I'm... My mind boggles at these various questions. You know, a rational basis would be the closest thing we would... Yeah, see, it seems to me the animus might tell us whether or not the policy really was designed to do what it was said to design to do. But I'm not sure that animus changes the level of scrutiny that we have to apply to the policy. You know, courts have, again, in the past, Moreno and other decisions have been very clear that, you know, when there's, you know... And, you know, just express bare desire to harm that... Yeah, and I'm with you there. I understand that. If the policy is just based on a bare desire to harm, we're done. I'm trying to figure out what we do if we find that the policy is, in part, based on a bare desire or may have been promulgated because of a desire to harm, but, in fact, absent that desire would pass the appropriate level of scrutiny and justification. Yeah, yeah, yeah. That's why I went through the long hypothetical first. Well, I mean, I would still argue that at the end of the day, this policy is just irrational. It's not... They haven't provided, you know, sufficient justifications. They haven't bothered to look at seven years of evidence at their fingertips, you know, and that would be the argument we would make. Thank you. Any other opportunity questioners? All right. The government, you have five minutes for rebuttal. Thank you, Your Honor. So I did want to revisit the as applied issue just to hone in on one aspect. So it's not just a question of whether they get to serve in the military or not. The First Amendment claim that they have is premised upon the idea that they're made a determination that everyone has to utilize the same grooming as well as the same salutations based on your biological sex. So that would still present issues when it comes to unit cohesion and good order and discipline, even as applied, because they're not just asking. But aren't aren't aren't these people all now serving? Using grooming standards and uniform standards, et cetera, that applies to. I don't want to use an inappropriate term, but I'll use it anyway to their chosen sex. So, Your Honor, that would still it would effectively mean that the court not just says that they can serve in the military, but that they get to serve under the conditions of the last administration. But they have been serving under those conditions. And as to these seven people and I don't you haven't responded to this. So I assume that you're agreeing with me. There's no evidence that any of them have posed any legitimate problem to military to military cohesion or loyalty or anything else. So and they have been serving under serving using grooming standards, et cetera, that apply to their, as I just said, chosen gender. So why, as to them, not as the group as a whole, but why, as to them, does that make a difference? Because, Your Honor, there's no way for the court to slice that piece out without limiting the military's overall ability. No, I'm not. I'm now saying we say I'm again giving you a high hypothetical opinion. This is only that will only treat this as an as applied challenge. We have seven people in front of us with exemplary, exemplary military service who have served under the under the various conditions we've talked about. And there's no we can't find any good means means objectives measure that would suggest why they need to be separated. We're not saying what the military can do as to anybody else. We just have these seven people in front of us. So tell me why. Tell me once again why other than hypothetical future problems that apparently have never occurred with these people or anybody else serving in the last four years. We should we should allow you to separate these people from the military. So, Your Honor, as one example, the privacy interest that affects how it's been a problem. I can't say there's anything in the record with these individual plaintiffs either. I can't find it. I have a related question. An oral argument in front of the district court. You respond. The government responded. I don't know if you're not forgive me. The government responded. There was nothing. No evidence associating transgender people with a lack of honesty or humility. That's an FDR 10 13. Is there any evidence associating transgender service members with a lack of integrity? So, Your Honor, there's no evidence in the record of that. OK, I'm going to ask the other four traits. I'm not trying to be pedantic, but I want to make sure I'm not missing anything. There are a lot of different studies. The other traits attributed to a lack of trustworthiness. So, Your Honor, there's no evidence in the record on that.  There's no evidence in the record on that. Truth. The same answer. And the same answer for a lack of discipline. There's the same answer for that. All right. So, Your Honor, I also wanted to spend a little bit of time on the due process argument. One of the questions that came up is what process they're due. But before we get there, I think we have to operate off the concession made by both sides, which is that nobody has a property interest in their continued military service. So, what they do is they have the reliance or the stigma plus. But the reason that the stigma plus doesn't work here is because the way the stigma plus works is that you have something on you that affects your future employment outside of the employment that you might be losing. Right. And I think their argument is we've now been branded as people who lack honesty, humility, integrity, selflessness, honor, truth, and discipline. And that scars us. So, Your Honor, I think        that's my word. I didn't use the word scars, but I think that's the argument. So, Your Honor, how it would work in practice, when they get discharged, they would get an honorable discharge. And whenever they apply for another job, they ask, did you serve in the military and what was the characterization of your service? So, unless there's more evidence than that, all they would put down is that they served honorably and that would be the end of it. Hasn't this secretary, hasn't this policy, I don't mean to personalize this in any way, but the policy has, I think, attributed all of these traits to them, sir. So, Your Honor, what if  it matters, though, is what the stigma actually is when they go around the outside. But they're saying they wouldn't have to fess up. Not that this wouldn't apply to them. There's this very broad brush and it's quite unusual that we'd be in a position where the government would have to say, and I appreciate your candor, that there's nothing in the record that supports it. So, Your Honor, but that doesn't apply to how the Stigma Plus operates. It has to be something known within a community and it affects their ability to get future employment. But if they were to       Well, that goes back to my point about, I guess they wouldn't have to, what you're saying is they wouldn't have to disclose that. They wouldn't have to fess up. Of course, this argument is being streamed live. These are not private proceedings. So, Your Honor, whether they put their name on a public case or not is not the deciding factor in a Stigma Plus claim. It did not affect them going forward. Because their service is branded as honorable and they retain all their rights and benefits that are associated with VA service, which, for instance, includes the     medical insurance, which they would get through the VA after they're separated, even on this basis. And they still, for instance, maintain the same rights that any member who served honorably has received. That's not the privilege to continue to serve, and this is their chosen career. So, Your Honor, that's where the issue of Stigma Plus and what it means, because no one has a property interest in their continued military service. So, the idea of Stigma Plus is that it affects a tangible interest for future employment outside of the military context.      So, we set these aside. Is there no place, and this is not a rhetorical question, the district court didn't make a finding of animus. I think we've all recognized that. But there are these comments, and what I'll say for my part is that these seem to be facially disparaging. And we've just run through the list of them. And you've been very candid about saying there isn't any evidence supporting any of this. So, in your analysis, did these simply fall out and play no role in our analysis? So, Your Honor, if the court were to reach the question of animus, we still believe... I'm not suggesting that. I'm asking if we don't. Because the district court didn't make a finding of animus. Then, is it your position that these statements fall out and we ignore them? So, Your Honor, they would play no role, because in the policy itself, it classifies based on a medical condition. So, the guidance doesn't. You and I have been over that many times. And let me ask you this a little more specifically. Would the district court        say that these statements affect the level of deference we give to the military policy? We're looking for reasons. Military judgment. You said that these statements... You haven't tried to defend them as non-disparaging, which I appreciate. And you have said that there isn't evidence supporting them. So, do those statements affect the level of deference, sir? No, Your Honor. Because as long as the military used its professional judgment, which is based on the past review of the mattice policy along with the literature review, they wouldn't be related to    They wouldn't be relevant for that purpose. They would only be relevant for animus. Couldn't a finder of fact find that the military, in fact, didn't exercise its professional judgment here because it had been instructed by the commander in chief to arrive at a result? But that's not what happened here, Your Honor. Oh, surely it is. It's precisely what happened. The commander in chief said, I want you to do something because I regard these people as having characteristics that you now admit there's no evidence in the record. To support that, I  And the military then comes up with a policy that, on its own, might look like it was based on professional judgment, but which a finder of fact might find that was driven by an order by the commander in chief. Why isn't that a permissible finding on this record? No, Your Honor, because the guidance itself uses the term gender dysphoria, and it's basically identical to the mattice policy without the grandfather clause. So I had one other            factual question, because early on in this case, there was some dispute about what kind of discharge people discharged under this policy would receive. And at one point, somebody said, well, it's almost as good as an honorable discharge. I take it we're now at a point where both sides agree that if someone is discharged because of this policy, they will receive an honorable discharge? That is absolutely correct, Your Honor. And one more brief point I wanted to make on remand versus hold. I think it's important to        clarify what our earlier statements was. If this court believes that it would benefit from seeing what the Supreme Court believes... My question was what you wanted. The three of us will decide what we would benefit from. I just wanted to know what you wanted. Yes, Your Honor. So if it's going to be... It does appear that it might be a few months before his detox is decided. So rather than have a situation where the court comes out with an opinion, and a couple weeks later, the Supreme Court comes out with something that requires      reassessment, we don't believe that it would be problematic to hold. But we do believe a remand would be problematic.  I'm not asking if it's problematic. I'm asking you represent the government of the United States. Your choice. Do you want us to hold this or do you want us to decide it? So, Your Honor, our position is no remand, but either hold or decide. I have one more question. Sorry, Judge Callahan. No, go ahead. Just one more. Is it possible to be transgender and not experience an incongruence between one's experience expressed and natal gender? So, Your Honor, the way that we frame it, everyone suffering from gender dysphoria would be trans-identifying since that's one of the symptoms listed, but not everyone who is trans-identifying suffers from gender dysphoria. Yes. Thank you. Thank you. All right. That will conclude argument. Thank you, counsel, for both your arguments. It's helpful to the court, and we appreciate that. We're going to just take a brief recess, so if any people only that want to be here for this    case, as I said, you're welcome to stay for a remote hearing. But if you want to be excused, go ahead and excuse yourself, and we'll be back and we'll take a 15-minute recess. All right. Court stands in recess until quarter of 11. Thank you. All right.                Thank you. Thank you. Thank you.
judges: CALLAHAN, CHRISTEN, HURWITZ